08-5637-cv

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2009

(Argued: September 21, 2009                    Decided: January 13, 2010)

Docket No. 08-5637-cv

_____

KEVIN STARR, MATT PUTMAN, CINDY SELEY, on behalf of herself and all others similarly situated, DAVID PASCHKETT, on behalf of all others similarly situated, CHRISTOPHER MICHAUD, on behalf of himself and all others similarly situated, LISA OWENS, RICHARD BENHAM, on behalf of himself and all others similarly situated, KEATON LANDRY, individually and on behalf of all others similarly situated, SHERI CLARK, RACHAEL HALL and MITCHELL HORTON,

*Plaintiffs-Appellants*,

—v.—

SONY BMG MUSIC ENTERTAINMENT, SONY CORPORATION OF AMERICA, BERTELSMANN, INC., UNIVERSAL MUSIC GROUP, TIME WARNER INC., formerly known as AOL Time Warner Cable, Inc., WARNER MUSIC GROUP CORP., EMI MUSIC NORTH AMERICA, CAPITOL RECORDS INC., doing business as EMI Music North America, JOHN DOES 1-100, BERTELSMANN MUSIC GROUP, INC., BMG MUSIC, BMG MUSIC PUBLISHING, doing business as The RCA Record Label, CAPITOL-EMI MUSIC, INC. and VIRGIN RECORDS AMERICA, INC.,

*Defendants-Appellees*.[*]

_____

B e f o r e :

NEWMAN, WALKER, and KATZMANN, *Circuit Judges*.
_____

_____

[*] The Clerk of the Court is directed to amend the official caption as set forth above.

Appeal from a judgment of the United States District Court for the Southern District of New York (Loretta Preska, *Judge*), entered October 21, 2008, dismissing Plaintiffs-Appellants' Second Consolidated Amended Complaint ("SCAC") for failure to state a claim upon which relief can be granted. We hold that the SCAC contains "enough factual matter (taken as true) to suggest that an agreement was made," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and therefore states a claim for violation of Section 1 of the Sherman Act. We therefore vacate the judgment of the district court and remand for further proceedings consistent with this opinion.

_____

GARY S. JACOBSON (Christopher Lovell, Imtiaz A. Siddiqui, *of counsel*), Lovell Stewart Halebian LLP, New York, NY; John Stoia and Bonny Sweeney, *of counsel*, Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA, *for Plaintiffs-Appellants.*

KENNETH R. LOGAN (Helena Almeida, *of counsel*), Simpson Thacher & Bartlett LLP, New York, NY; Alan M. Wiseman, Mark C. Schechter, and Thomas A. Isaacson, *of counsel*, Howrey LLP, Washington, DC; Peter T. Barbur and Rachel G. Skaistis, *of counsel*, Cravath, Swaine & Moore LLP, New York, NY, *for Defendants-Appellees.*

_____

KATZMANN, *Circuit Judge*:

This case calls upon us to determine whether an antitrust complaint alleging a conspiracy by major record labels to fix the prices and terms under which their music would be sold over the Internet states a claim for violation of Section 1 of the Sherman Act under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). We hold that Plaintiffs-Appellants' Second Consolidated Amended Complaint ("SCAC") contains "enough factual matter (taken as true) to suggest that an agreement was made," *id.* at 555, and therefore states a claim. We vacate the judgment of the district court and remand for further proceedings consistent with this opinion.

2

**BACKGROUND**

The SCAC contains the following non-conclusory factual allegations, which we must accept as true.[1]

Defendants produce, license and distribute music sold as digital files ("Digital Music") online via the Internet ("Internet Music") and on compact discs ("CDs"). Together, defendants EMI, Sony BMG Music Entertainment ("Sony BMG"), Universal Music Group Recordings, Inc. ("UMG"), and Warner Music Group Corp. ("WMG"), control over 80% of Digital Music sold to end purchasers in the United States.

Initially, defendants Bertelsmann, Inc. ("Bertelsmann"), WMG, and EMI agreed to launch a service called MusicNet. Defendants UMG and Sony Corporation ("Sony") agreed to launch a service called Duet, later renamed pressplay. All defendants signed distribution agreements with MusicNet or pressplay and sold music directly to consumers over the Internet through these ventures (the "joint ventures"). Both the joint ventures and the Recording Industry Association of America ("RIAA") provided a forum and means through which defendants could communicate about pricing, terms, and use restrictions.

To obtain Internet Music from all major record labels, a consumer initially would have had to subscribe to both MusicNet and pressplay, at a cost of approximately $240 per year. Both services required consumers to agree to unpopular Digital Rights Management terms ("DRMs").

---

[1] The Supreme Court's most recent iteration of the Federal Rules of Civil Procedure Rule 8(a) pleading standard stresses that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. . . . [Therefore,] a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949-50 (May 18, 2009). We accept that invitation here, and do not include those allegations in the SCAC that "are no more than conclusions."

3

For example, pressplay prohibited consumers from copying more than two songs from any particular artist onto a CD each month. Music purchased from MusicNet and pressplay would often "expire" unless repurchased: A MusicNet consumer would need to repurchase music each year and a pressplay consumer who unsubscribed would immediately lose access to all of the music he or she had purchased. MusicNet and pressplay also did not allow consumers to transfer songs from their computers to portable digital music players like the iPod. One industry commentator observed that MusicNet and pressplay did not offer reasonable prices, and one prominent computer industry magazine concluded that "nobody in their right mind will want to use" these services. SCAC ¶ 77.

Moreover, the pricing of CDs accounted for costs such as copying the compact discs; producing the CD case, labels and anti-shoplifting packaging; shipping, both to the distributor and then to record stores; labor, such as shelving CDs and staffing cash registers; and damaged and unsold inventory. All of these costs were eliminated with Internet Music. SCAC ¶ 71. However, these dramatic cost reductions were not accompanied by dramatic price reductions for Internet Music, as would be expected in a competitive market.

Eventually, defendants and the joint ventures began to sell Internet Music to consumers through entities they did not own or control. However, the entities could only sell defendants' music if they contracted with MusicNet to provide Internet Music for the same prices and with the same restrictions as MusicNet itself or other MusicNet licensees. If the licensee attempted to license music from another company, defendants forced them to pay penalties or terminated their licenses. In addition, each defendant was paid shares of the total revenue generated by a joint venture licensee, rather than on a per song basis, linking each defendant's financial interest in the

4

joint venture to the total sales of all labels rather than to its own market share.

Defendants also used Most Favored Nation clauses ("MFNs") in their licenses that had the effect of guaranteeing that the licensor who signed the clause received terms no less favorable than the terms offered to other licensors. Defendants attempted to hide the MFNs because they knew they would attract antitrust scrutiny. For example, EMI and MusicNet had a "side letter" agreement which assured that EMI's core terms would be no less favorable than Bertelsmann's and WMG's. "EMI CEO Rob Glaser decided to put the MFN in a secret side letter because 'there are legal/antitrust reasons why it would be bad idea to have MFN clauses in any, or certainly all, of these agreements.'" SCAC ¶ 95. UMG also used MFN clauses in its license agreements. A January 12, 2006 article in the Wall Street Journal confirmed that defendants used MFNs, and, according to Jonathan Potter, the executive director of the Digital Music Association, "seller-side MFNs are inherently price-increasing and anticompetitive." SCAC ¶ 97.

Edgar Bronfman, Jr., the current CEO of WMG, explained pressplay's pricing scheme as follows:

> Pressplay has what we call an affiliate model where we determine the price, and we offer a percentage of that price to the retailing partner . . . . The reason we've chosen that, frankly, is because we are concerned that the continuing devaluation of music will proceed unabated unless we do something about it.

SCAC ¶ 86.

After services other than defendants' joint ventures began to distribute defendants' Internet Music, defendants "agreed"[2] to a wholesale price floor of about 70 cents per song, which

---

[2] The allegation that defendants agreed to this price floor is obviously conclusory, and is not accepted as true.

5

they enforced in part through MFN agreements. The MFN agreements, signed by Internet Music retailers and defendants, specified that the retailers had to pay each defendant the same amount per song. Whereas eMusic, the most popular online music service selling Internet Music owned by independent labels, currently charges $0.25 per song and places no restrictions on how purchasers can upload their music to digital music players (like the iPod) or burn to CDs, defendants' wholesale price is more than double, about $0.70 per song. Moreover, all defendants refuse to do business with eMusic, the #2 Internet Music retailer behind only the iTunes Store.

Finally, the SCAC alleges that defendants' price fixing is currently the subject of: 1) a pending investigation by the Office of the New York State Attorney General regarding wholesale prices charged for Internet Music; 2) a Department of Justice ("DOJ") investigation into collusion and price fixing begun in March 2006; and 3) a DOJ investigation into whether defendants misled DOJ about the formation and operation of MusicNet and pressplay.

Based on all of these factual allegations, plaintiffs allege that defendants engaged in a continuing conspiracy to "restrain the availability and distribution of Internet Music, fix and maintain at artificially high and non-competitive levels the prices at which they sold Internet Music and impose unreasonably restrictive terms in the purchase and use of Internet Music." SCAC ¶ 126. They also allege that they were injured by paying more for Internet Music and CDs than they would have in the absence of an illegal agreement.

From December 29, 2005 through July 2006, plaintiffs filed actions in various state and federal courts, alleging defendants had agreed to fix the price of Digital Music. The Judicial Panel on Multidistrict Litigation transferred and centralized twenty-eight actions to the Southern District of New York, before Judge Loretta Preska. In April 2007, plaintiffs filed a First

Consolidated Amended Complaint. Pursuant to the district court's orders, defendants then provided plaintiffs with a letter summarizing the grounds on which they intended to move to dismiss the First Consolidated Amended Complaint. Plaintiffs filed a Second Consolidated Amended Complaint ("SCAC") in June 2007. The SCAC brought claims under Section 1 of the Sherman Act and state antitrust and unfair and deceptive trade practices statutes. It also brought state common law claims for unjust enrichment. On July 30, 2007 defendants moved to dismiss the SCAC, pursuant to Federal Rule of Civil Procedure 12(b)(6).

At oral argument, plaintiffs requested leave to amend paragraph ninety-nine of the SCAC to allege a parallel price increase. The proposed amendment alleged that:

> By early 2005, Defendants Sony BMG's, Capitol-EMI Music's, UMG's and WMG's direct costs had gone substantially down because each of these Defendants' digitization costs of the initial cataloging had been completed, technological improvements (including increased computer processing power and speed) had reduced the remaining costs of digitizing new releases, the return and store credit and other costs alleged in ¶ 71 remained at zero or virtually zero despite substantially higher sales volumes, and the fixed costs of each of these Defendants' digital business per unit of sales volume had declined by approximately two-thirds. Nonetheless, these Defendants then engaged in or about May 2005 in the parallel, highly unusual behavior of each raising prices from the 65 cents per song level to at or about 70 cents per song . . . .
>
> These parallel, highly unusual increases in prices when direct costs had substantially decreased, enforced by MFNs, were similar to Defendants' causing, as alleged in ¶¶ 74-75, the joint ventures, via MFNs and other means, to increase the prices of Internet Music during 2002 to 2003 to unreasonably high levels despite substantial reductions in the direct costs of Internet Music relative to CDs.

Third Consolidated Amendment Complaint ¶ 99.

By Memorandum and Order dated October 9, 2008, the district court granted the defendants' motion to dismiss, holding that the complaint did not state a claim under *Bell Atlantic Corp. v. Twombly*. The district court first found that plaintiffs did not challenge the existence or creation of the joint ventures, and the operation of the joint ventures therefore did

7

not yield an inference of illegal agreement. At the same time, the district court held that plaintiffs' "bald allegation that the joint ventures were shams is conclusory and implausible." *In re Digital Music Antitrust Litig.*, 592 F. Supp. 2d 435, 442 (S.D.N.Y. 2008). According to the district court, plaintiffs did not challenge the joint ventures' "explicit agreement," and any inference "of subsequent agreement based on prior, unchallenged explicit agreement is unreasonable." *Id.* at 443. The district court went on to hold that other circumstances alleged by plaintiffs were "equivocal" and did not justify the inference of agreement, and the imposition of the unpopular DRMs and pricing structure was not against defendants' individual economic self-interest when viewed against the backdrop of widespread music piracy. *Id.* at 444-45. Finally, the district court denied plaintiffs' motion to amend paragraph ninety-nine of the SCAC as futile. *Id.* at 445 n.14. This appeal followed.

## DISCUSSION

We review *de novo* a district court's dismissal of a complaint for failure to state a claim under Federal Rules of Civil Procedure Rule 12(b)(6), accepting all factual allegations as true, but "giving no effect to legal conclusions couched as factual allegations." *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007). We review the denial of leave to amend a complaint for abuse of discretion, unless the denial was based on an interpretation of law, in which case the legal conclusion is reviewed *de novo*. *Jones v. N.Y. State Div. of Military and Naval Affairs*, 166 F.3d 45, 49 (2d Cir. 1999).

Generally, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the

8

elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotation marks omitted) (alteration in original) (citations omitted). Instead, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations omitted). What is required are "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. In the words of the Supreme Court's most recent iteration of this standard, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, -- U.S. --, 129 S.Ct. 1937, 1949 (2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," however, dismissal is appropriate. *Id.* at 1950.

Under Section 1 of the Sherman Act, "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is . . . illegal." 15 U.S.C. § 1. The crucial question in a Section 1 case is therefore whether the challenged conduct "stem[s] from independent decision or from an agreement, tacit or express." *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954). Although parallel business behavior "is admissible circumstantial evidence from which the fact finder may infer agreement," it does not itself constitute a violation of the Sherman Act, because it is "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly*, 550 U.S. 553-54 (internal quotation marks omitted).

While for purposes of a summary judgment motion, a Section 1 plaintiff must offer evidence that "tend[s] to rule out the possibility that the defendants were acting independently,"

9

*id.* at 554 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)), to survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only allege "enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556; *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (quoting *Twombly* for the same proposition).

As the Supreme Court clarified in *Twombly*:

> Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.

*Id.* at 556 (footnote and internal quotation marks omitted).

Thus, an allegation of parallel conduct coupled with only a bare assertion of conspiracy is not sufficient to state a Section 1 claim. *Id.* Instead, allegations of parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557. Examples of a parallel conduct allegation that would suffice under this standard include "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Id.* at 556 n.4 (internal quotation marks omitted).

In *Twombly*, plaintiffs brought a Section 1 claim centered around the market for local telephone service. In 1984, a system of seven regional local-telephone-service monopolies, called Baby Bells, was created, along with a separate, competitive market for long-distance telephone service from which the regional Baby Bells were excluded. *Id.* at 549. In 1996,

10

Congress withdrew approval for the regional Baby Bell monopolies in enacting the Telecommunications Act of 1996, which required the Baby Bells to share their local networks with competitors (called "CLECs"), in exchange for authority to enter the long-distance service market. *Id.* Not surprisingly, the Baby Bells vigorously litigated their "sharing" obligations under the Act. *Id.* Not satisfied with the Baby Bells' efforts at sharing, the plaintiffs in *Twombly* sued, alleging that the Baby Bells engaged in parallel conduct in their respective regions, including making unfair agreements with the CLECs for access to Baby Bell networks, providing CLECs inferior connections to those networks, and overcharging the CLECs, all in order to inhibit the growth of CLECs and prevent them from competing effectively with the Baby Bells. *Id.* at 550-51. The complaint also alleged that the Baby Bells' failure to compete with one another, coupled with a statement from one Baby Bell's CEO that competing in the territory of another Baby Bell "might be a good way to turn a quick dollar but that doesn't make it right," supported the allegation that the Baby Bells entered into a conspiracy to prevent entry into their local markets and agreed to refrain from competing with one another. *Id.* at 551.

The Supreme Court held that the ultimate conspiracy allegation was merely a "legal conclusion[] resting on the prior allegations," *id.* at 564, and the actual factual allegations in the complaint were insufficient because they did not "invest[] either the action or inaction alleged with a plausible suggestion of conspiracy." *Id.* at 566. It was natural for each Baby Bell to resist the competition from the CLECs that the 1996 Act mandated, and "nothing in the complaint intimates that the resistance to the [CLECs] was anything more than the natural, unilateral reaction of each [Baby Bell] intent on keeping its regional dominance." *Id.* at 566. As to the Baby Bells' failure to encroach on each others' territory, given that prior to the

11

Telecommunications Act of 1996 monopoly was the norm, rather than the exception, "a natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same . . . . [T]he complaint itself [gave] reasons to believe that the [Baby Bells] would see their best interests in keeping to their old turf." *Id.* at 568.

Applying the language and reasoning of *Twombly* to the facts of this case leads us to conclude respectfully that the district court erred in dismissing the complaint for failure to state a Section 1 claim. The present complaint succeeds where *Twombly's* failed because the complaint alleges specific facts sufficient to plausibly suggest that the parallel conduct alleged was the result of an agreement among the defendants. As discussed above, the complaint contains the following non-conclusory factual allegations of parallel conduct. First, defendants agreed to launch MusicNet and pressplay, both of which charged unreasonably high prices and contained similar DRMs. Second, none of the defendants dramatically reduced their prices for Internet Music (as compared to CDs), despite the fact that all defendants experienced dramatic cost reductions in producing Internet Music. Third, when defendants began to sell Internet Music through entities they did not own or control, they maintained the same unreasonably high prices and DRMs as MusicNet itself. Fourth, defendants used MFNs in their licenses that had the effect of guaranteeing that the licensor who signed the MFN received terms no less favorable than terms offered to other licensors. For example, both EMI and UMG used MFN clauses in their licensing agreements with MusicNet. Fifth, defendants used the MFNs to enforce a wholesale price floor of about 70 cents per song. Sixth, all defendants refuse to do business with eMusic, the #2 Internet Music retailer. Seventh, in or about May 2005, all defendants raised wholesale

12

prices from about $0.65 per song to $0.70 per song. This price increase was enforced by MFNs.[3]

More importantly, the following allegations, taken together, place the parallel conduct "in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. First, defendants control over 80% of Digital Music sold to end purchasers in the United States. *See* 7 Phillip E. Areeda and Herbert Hovenkamp, *Antitrust Law* (hereinafter "Areeda & Hovenkamp") § 1431a (2d ed. 2003) ("[E]mpirical studies considering many industries have suggested that noncompetitive pricing [that may be the result of price coordination] is likely to appear when the four leading firms account for some 50 to 80 percent of the market."). Second, one industry commentator noted that "nobody in their right mind" would want to use MusicNet or pressplay, suggesting that some form of agreement among defendants would have been needed to render the enterprises profitable. *See id.* § 1415b ("Some acts, or failures to act, cannot be profitably continued unless rivals behave in parallel."); *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360-361 (3d Cir.

---

[3] Because the proposed amendment to paragraph ninety-nine of the SCAC contained, along with the remainder of the complaint, "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement," *Twombly*, 555 U.S. at 556, the district court erred in denying the motion to amend on the ground of futility. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007). Therefore, we include the allegations contained in proposed paragraph ninety-nine within our discussion of the SCAC as a whole. In so doing, we reject defendants' argument that the proposed amendment would have been futile because it alleged that prices rose in or about May 2005, but costs declined four years earlier, in 2001. As can be seen above, paragraph seventy-one of the original complaint alleged that initial costs of distributing Internet Music fell because the price of distributing CDs accounted for costs such as copying the compact discs, producing the CD case, and labor, all of which were eliminated in distributing Internet Music. In contrast, the proposed amendment to paragraph ninety-nine alleged that by May 2005 the costs of distributing Internet Music had fallen because the digitization costs of the initial Internet cataloging had been completed and technological improvements (including increased computer processing power) had reduced the remaining costs of digitizing new releases. These are not the same costs that are alleged to have decreased in paragraph seventy-one of the original complaint.

13

2004) ("Evidence that the defendant acted contrary to its interests means evidence of conduct that would be irrational assuming that the defendant operated in a competitive market. In a competitive industry, for example, a firm would cut its price with the hope of increasing its market share if its competitors were setting prices above marginal costs."). Third, the quote from Edgar Bronfman, the current CEO of WMG, suggests that pressplay was formed expressly as an effort to stop the "continuing devaluation of music."

Fourth, defendants attempted to hide their MFNs because they knew they would attract antitrust scrutiny. For example, EMI and MusicNet's MFN, which assured that EMI's core terms would be no less favorable than Bertelsmann's or WMG's, was contained in a secret side letter. "EMI CEO Rob Glaser decided to put the MFN in a secret side letter because 'there are legal/antitrust reasons why it would be bad idea to have MFN clauses in any, or certainly all, of these agreements." SCAC ¶ 95. According to the executive director of the Digital Music Association, seller-side MFNs are "inherently price-increasing and anticompetitive." SCAC ¶ 97.

Fifth, whereas eMusic charges $0.25 per song, defendants' wholesale price is about $0.70 per song. *See* 7 Areeda & Hovenkamp § 1415b ("[O]ne cannot profitably increase its price above that charged by rivals unless they follow the price-raiser's lead."). Sixth, defendants' price-fixing is the subject of a pending investigation by the New York State Attorney General and two separate investigations by the Department of Justice. Finally, defendants raised wholesale prices from about $0.65 per song to $0.70 per song in or about May 2005, even though earlier that year defendants' costs of providing Internet Music had decreased substantially due to completion of the initial digital cataloging of all Internet Music and technological improvements

14

that reduced the costs of digitizing new releases. *See* Richard A. Posner, *Antitrust Law* 88 (2d ed. 2001) ("Simultaneous price increases . . . unexplained by any increases in cost may therefore be good evidence of the initiation of a price-fixing scheme.").

This complaint does not resemble those our sister circuits have held fail to state a claim under *Twombly*. *See, e.g.*, *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 975-976 (9th Cir. 2008) (dismissing Section 1 price fixing complaint under *Twombly* where complaint alleged only that defendant conspired with "numerous" banks to fix the price of credit and debit card processing fees and received kickbacks from "numerous" banks as consideration for its unlawful agreement); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048-50 (9th Cir. 2008) (where plaintiffs alleged no facts to support their theory that defendant banks conspired or agreed with each other, dismissing Section 1 claim because plaintiffs pleaded only legal conclusions, and "failed to plead the necessary evidentiary facts to support those conclusions").

Defendants' arguments that plaintiffs have failed to state a claim are without merit. Defendants first argue that a plaintiff seeking damages under Section 1 of the Sherman act must allege facts that "tend[] to exclude independent self-interested conduct as an explanation for defendants' parallel behavior." Appellee's Br. 15-17. This is incorrect. Although the *Twombly* court acknowledged that for purposes of summary judgment a plaintiff must present evidence that tends to exclude the possibility of independent action, 550 U.S. at 554, and that the district court below had held that plaintiffs must allege additional facts that tended to exclude independent self-interested conduct, *id.* at 552, it specifically held that, to survive a motion to dismiss, plaintiffs need only "enough factual matter (taken as true) to suggest that an agreement was made," *id.* at 556; *see also* 2 Areeda & Hovenkamp § 307d1 (3d ed. 2007) ("[T]he Supreme Court did *not* hold

that the same standard applies to a complaint and a discovery record . . . . The 'plausibly suggesting' threshold for a conspiracy complaint remains considerably less than the 'tends to rule out the possibility' standard for summary judgment.").

Defendants next argue that *Twombly* requires that a plaintiff identify the specific time, place, or person related to each conspiracy allegation. This is also incorrect. The *Twombly* court noted, in dicta, that had the claim of agreement in that case not rested on the parallel conduct described in the complaint, "we doubt that the . . . references to an agreement among the [Baby Bells] would have given the notice required by Rule 8 . . . [because] the pleadings mentioned no specific time, place, or person involved in the alleged conspiracies." 550 at 565 n.10. In this case, as in *Twombly*, the claim of agreement rests on the parallel conduct described in the complaint. Therefore, plaintiffs were not required to mention a specific time, place or person involved in each conspiracy allegation.

Defendants then argue that inferring a conspiracy from the facts alleged is unreasonable because plaintiffs' allegations "are the very same claims that were thoroughly investigated and rejected by the Antitrust Division of the Department of Justice," Appellee's Br. 17-18, which closed its inquiry in December 2003 and publicly announced that it had uncovered no evidence that the joint ventures had harmed competition or consumers of digital music. Even if we could consider this evidence on a motion to dismiss, defendants cite no case to support the proposition that a civil antitrust complaint must be dismissed because a criminal investigation undertaken by the Department of Justice found no evidence of conspiracy. Second, this argument neglects the fact that the complaint alleges that the Department of Justice has, since 2003, launched two new investigations into whether defendants engaged in collusion and price fixing and whether

16

defendants misled the Department about the formation and operation of MusicNet and pressplay.

The only one of defendants' contentions that merits more than a brief discussion is the impact of the Supreme Court's decision in *Texaco Inc. v. Dagher*, 547 U.S. 1 (2006). That case concerned a joint venture formed by Texaco and Shell Oil to completely consolidate their operations in the western United States. The joint venture, Equilon, produced significant cost savings in production and marketing, *see Dagher v. Saudi Refining, Inc.*, 369 F.3d 1108, 1111 (9th Cir. 2004), *rev'd*, 547 U.S. 1 (2006), and ended competition between Texaco and Shell Oil altogether in the domestic refining and selling of gasoline. Because Texaco and Shell Oil's market share exceeded twenty-five percent, *id.*, the formation of Equilon was approved by consent decree by the Federal Trade Commission, as well as by state attorneys general in California, Hawaii, Oregon, and Washington. *Dagher*, 547 U.S. at 4. Plaintiffs sued, alleging that in allowing Equilon to determine the price of gasoline, Texaco and Shell Oil violated the *per se* rule against price fixing under § 1 of the Sherman Act. The district court granted summary judgment to Texaco and Shell Oil, holding that the rule of reason, rather than a *per se* rule, governed the claim, and because plaintiffs eschewed the rule of reason analysis, judgment was appropriate as a matter of law. *Id.*[4] The Supreme Court agreed, holding that Equilon's pricing policy was not a price-fixing agreement between competitors, because Texaco and Shell Oil did

---

[4] A short explanation of *per se* illegality versus the rule of reason is in order. *Per se* liability is reserved "for only those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Dagher*, 547 U.S. at 5 (internal quotation marks omitted). Price-fixing agreements between competitors are generally *per se* unlawful, meaning they are prohibited despite the reasonableness of the particular prices agreed upon. *Id*; *see also* 7 Areeda & Hovenkamp § 1509a (2d ed. 2003). In contrast, under the rule of reason analysis, which presumptively applies to Section 1 claims, "antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful." *Daghher,* 547 U.S. at 5.

17

not compete with one another in the relevant market (the sale of gasoline).  Therefore, the *per se* rule against price fixing did not apply.  *Id.* at 5-6.  In its holding, the Supreme Court presumed that Equilon was a lawful joint venture, because its formation had been approved by federal and state regulators and plaintiffs did not argue that it was a sham.  *Id.* at 6 n.1.  Finally, the Supreme Court noted that despite the lawfulness of the joint venture plaintiffs could have, but did not, challenge Equilon's pricing policy under the rule of reason.  *Id.* at 7.

*Dagher* does not support the dismissal of the complaint in this case.  First, although the district court below stated that plaintiffs did not challenge the joint ventures here, the complaint makes clear that plaintiffs do challenge the joint ventures.  *See, e.g.*, SCAC ¶¶ 67, 72-73, 76, 78, 81-83, 85.  In the legal memorandum relied upon by the district court for the proposition that plaintiffs did not challenge the joint ventures, plaintiffs wrote that while "it is not the existence or creation of these joint ventures that form the basis of the [p]laintiffs' allegations," defendants used the joint ventures "as a means to implement their anticompetitive agreements" and to "facilitat[e] anticompetitive . . . horizontal combinations."  *See* Pls.' Consolidated Mem. of Law in Opp'n to Defs.' Supplemental Mem. of Law 10-11.  The memorandum also called MusicNet and pressplay "mere puppets of [the] [d]efendants."  *See id.* at 11.  The district court implicitly acknowledged that plaintiffs did challenge the joint ventures when it held that plaintiffs' allegation that the joint ventures were shams was conclusory and implausible.  Plaintiffs continue to challenge the joint ventures on appeal, and defendants do not contend that MusicNet or pressplay were explicitly approved by state or federal regulators.  Therefore, the *Dagher* Court's presumption that Equilon was lawful because its formation had been approved by federal and state regulators and plaintiffs did not argue that it was a sham, 547 U.S. at 6 n.1, is not applicable

18

here.[5]  Second, even if we were to presume that MusicNet and pressplay were lawful, which we

do not, plaintiffs would still be free to challenge their activities pursuant to the rule of reason.

*Dagher*, 547 U.S. at 6 n.1.  The complaint alleges that the activities of the joint ventures actually

were anticompetitive and unreasonable, SCAC ¶ 126, and, unlike in *Dagher*, plaintiffs in this

case have not "eschewed" a rule of reason analysis.  Similarly, the complaint contains many

allegations of conduct that took place outside of the joint ventures, and are therefore not affected

by *Dagher*.  For all of these reasons, *Dagher* does not support dismissal of the SCAC.

Finally, defendants claim that the conduct alleged in the complaint "would be entirely

consistent with independent, though parallel, action."  Appellee's Br. 20.  Under *Twombly*,

allegations of parallel conduct that could "just as well be independent action" are not sufficient to

state a claim.  550 U.S. at 557.  However, in this case plaintiffs have alleged behavior that would

plausibly contravene each defendant's self-interest "in the absence of similar behavior by rivals."

---

[5] We note that some commentators continue to believe that *Dagher* does not foreclose the application of the *per se* rule against price-fixing in the case of a lawful joint venture where the price fixing itself is not related to the purpose of the joint venture or the joint venture does not result in significant economic benefits.  *See* Areeda & Hovenkamp 2009 Supplement § 2132 (arguing that if General Motors and Toyota were to form a joint venture for the production of hybrid car engines, but then place the engines in cars they designed and produced separately, the Supreme Court would not permit them to fix the prices of the finished cars as part of the lawful joint venture); *see also* 12 Areeda & Hovemkamp § 2004a (2d ed. 2005) (noting that the *per se* rule against price fixing "applies virtually without exception when the price fix is 'naked' in the sense that it does not accompany any significant integration of research and development, production or distribution. . . . As a general matter, price fixing is tolerated only in the case of the joint venture producing significant, output-increasing efficiencies, and where the price fixing itself can be shown to be essential to these social gains."); 11 Areeda & Hovenkamp § 1912c (2d ed. 2005) (explaining that the rule of reason is applied to a joint venture's horizontal restraint when the joint venture seems to be productive or reasonable on its face and the particular challenged agreement seems to be  reasonably necessary to the purpose of the venture).  In this case, the SCAC obviously does not allege that MusicNet or pressplay were economically efficient in integrating research, development, production, or distribution or that price fixing was reasonably necessary to any social gain the ventures may have produced.

7 Areeda & Hovenkamp § 1415a (2d ed. 2003); *see also* Posner, *supra*, at 100. For example, it would not be in each individual defendant's self-interest to sell Internet Music at prices, and with DRMs, that were so unpopular as to ensure that "nobody in their right mind" would want to purchase the music, unless the defendant's rivals were doing the same. For these reasons we hold that the SCAC states a claim under *Twombly*.[6]

## CONCLUSION

The Second Consolidated Amendment Complaint contains "plausible grounds to infer an agreement." *Twombly*, 550 U.S. at 556. We therefore hold that the district court erred in dismissing the complaint. The case is remanded for further proceedings consistent with this opinion.

---

[6] On appeal, three parent-company defendants, Bertelsmann, Inc., Sony Corporation of America, and Time Warner Inc., argue that even if the SCAC states a claim under *Twombly*, it fails to state a claim against them because plaintiffs allege no basis for piercing the corporate veil. Because the district court did not reach this question and the parties devote three total pages to it in their briefs, we remand to allow the district court to consider it in the first instance.

JON O. NEWMAN, Circuit Judge, concurring:

I concur in Judge Katzmann's comprehensive opinion, but add these additional words to explore a perplexing aspect of the Supreme Court's decision in Twombley v. Bell Atlantic, 550 U.S. 544 (2007).  As is well known, the Court there ruled insufficient to survive a motion to dismiss a complaint that endeavored to allege a price-fixing agreement in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.  The complaint had relied primarily on an allegation of the defendants' parallel conduct.

The perplexing aspect of the Court's opinion is contained in the very first paragraph of the Court's substantive discussion.  The Court there stated:

> While a showing of parallel "business behavior is admissible circumstantial evidence from which the fact finder may infer agreement," it falls short of "conclusively establish[ing] agreement or . . . itself constitut[ing] a Sherman Act offense.

Twombley, 550 U.S. at 553 (emphasis added) (citing Theatre Enterprises v. Paramount Film Distributing Corp., 346 U.S. 537, 540-41 (1954)) (alterations and ellipsis in original).[1]

If, as the Court states in the first part of this sentence, a

---

[1]The basis for perplexity is not lessened by the Court's subsequent statement that "[i]t makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice," Twombley, 550 U.S. at 556, apparently meaning will not suffice to defeat a motion to dismiss a complaint.

fact-finder is entitled to infer agreement from parallel conduct, one may wonder why a complaint alleging such conduct does not survive a motion to dismiss. The answer is surely not supplied by the remainder of the Court's sentence. That portion states the unexceptional proposition that parallel conduct alone is not <u>conclusive</u> evidence of an agreement to fix prices. To support that proposition, the Court cites <u>Theatre Enterprises</u>. But that case was an appeal by an antitrust plaintiff whose complaint had <u>survived</u> a motion to dismiss. Indeed, that plaintiff had been permitted to present its evidence to a jury, only to have the jury reject on the merits the claim of a section 1 violation. The plaintiff sought review on the ground that the trial court had erred in not granting a motion for a directed verdict in the plaintiff's favor. <u>See</u> <u>Theatre Enterprises</u>, 346 U.S. at 539. The Supreme Court understandably found no error. <u>See</u> <u>id.</u> at 539-42. In <u>Twombley</u>, the Court noted the extraordinary claim that the <u>Theatre Enterprise</u> plaintiff had made. "An antitrust conspiracy plaintiff with evidence showing nothing more than parallel conduct is not entitled <u>to a directed verdict</u>." <u>Twombley</u>, 550 U.S. at 554 (emphasis added).

The fact that an allegation of parallel conduct was held insufficient to require a directed verdict in the plaintiff's favor is hardly a basis for ruling that such an allegation is insufficient to survive a motion to dismiss for failure to state a claim on which

relief may be granted.

In view of the Court's initial observation in Twombley that parallel conduct is sufficient to support a permissible inference of an agreement, the reason for the rejection of the complaint in Twombley must arise from something other than the plaintiff's reliance on parallel conduct. That reason is not difficult to find. It is the context in which the defendants' parallel conduct occurred. "[W]hen allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." Id. at 557.

The context in Twombley was the aftermath of the divestiture of At&T's local telephone service, resulting in the creation of seven Regional Bell Operating Companies, the so-called "Baby Bells" or Incumbent Local Exchange Carriers ("ILECs"). See id. at 549. Originally restricted to providing local telephone service, the ILECs were later permitted by the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (Feb. 8, 1996), to enter the long-distance market upon compliance with conditions concerning the opportunity for competitive local exchange carriers ("CLECs") to make use of an ILEC's network. See Twombley, 550 U.S. at 549.

In that context, it was entirely understandable for the Court to cast a jaundiced eye on the claim that the parallel conduct of these

newly created ILECs would suffice to permit an inference of agreement.

As the Court observed:

> [The parallel conduct of the ILECs] was not suggestive of conspiracy, not if history teaches anything. In a traditionally unregulated industry with low barriers to entry, sparse competition among large firms dominating separate geographical segments of the market could very well signify illegal agreement, but here we have an obvious alternative explanation. In the decade preceding the 1996 Act and well before that, monopoly was the norm in telecommunications, not the exception. The ILECs were born in that world, doubtless liked the world the way it was, and surely knew the adage about him who lives by the sword. Hence, a natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing.

Id. at 567–68.

Two years after Twombley, the Court emphasized its view that whether a bare allegation of illegality would suffice to withstand a motion to dismiss depends on the context in which the allegation is made. "Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009).

I believe it would be a serious mistake to think that the Court has categorically rejected the availability of an inference of an unlawful section 1 agreement from parallel conduct. Even in those contexts in which an allegation of parallel conduct will not suffice

to take an antitrust plaintiff's case to the jury, it will sometimes suffice to overcome a motion to dismiss and permit some discovery, perhaps leaving the issue for later resolution on a motion for summary judgment.

In the pending case, as Judge Katzmann has carefully demonstrated, the context in which the defendants' alleged parallel conduct occurred, amplified by specific factual allegations making plausible an inference of agreement, suffices to render the allegation of a section 1 violation sufficient to withstand a motion to dismiss.